[Cite as *MW Custom Papers, L.L.C. v. Allstate Ins. Co*, 2014-Ohio-1112.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

MW CUSTOM PAPERS LLC           :

    Plaintiff-Appellant         :       C.A. CASE NO.   25430

v.                          :       T.C. NO.   12CV3228

ALLSTATE INSURANCE COMPANY,    :      (Civil appeal from
et al.                                 Common Pleas Court)
                            :

    Defendants-Appellees

                            :

. . . . . . . . . .

**O P I N I O N**

Rendered on the \_\_\_\_\_21st\_\_\_\_\_ day of _____March_____, 2014.

. . . . . . . . . .

JAMES A. DYER, Atty. Reg. No. 0006824 and TOBY K. HENDERSON, Atty. Reg. No. 0071378, 1900 Kettering Tower, 40 N. Main Street, Dayton, Ohio 45423
    Attorneys for Plaintiff-Appellant

STEPHEN V. FREEZE, Atty. Reg. No. 0012173, 1 S. Main Street, Suite 1800, Dayton, Ohio 45402
    Attorney for Defendant-Appellee Associated International Insurance Company

DANIEL F. GOURASH, Atty. Reg. No. 0032413 and ROBERT D. ANDERLE, Atty. Reg. No. 0064582, 26600 Detroit Road, Suite 300, Westlake, Ohio 44145
    Attorneys for Defendant-Appellee Federal Insurance Company

RONALD B. LEE, Atty. Reg. No. 0004957 and MOIRA H. PIETROWSKI, Atty. Reg. No. 0070308, 222 S. Main Street, Akron, Ohio 44308

and

PATRICK M. SHINE, Atty. Reg. No. 0002267, 33 W. Monroe, Suite 1325, Chicago, IL

60603
      Attorneys for Defendant-Appellee Fireman's Fund Insurance Company
DAVID W. WALULIK, Atty. Reg. No. 0076079, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202
      Attorney for Defendants-Appellees OneBeacon American Insurance Company, Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA

ARTHUR M. KAUFMAN, Atty. Reg. No. 0017724 and CHRISTOPHER W. ST. MARIE, Atty. Reg. No. 0087064, 200 Public Square, Suite 2800, Cleveland, Ohio 44114
      Attorneys for Defendant-Appellee Travelers Casualty and Surety Company

. . . . . . . . . .

FROELICH, J.

{¶ 1} MW Custom Papers, LLC appeals from a judgment of the Montgomery County Court of Common Pleas, which granted the motions to dismiss for lack of justiciability filed by Associated International Insurance Company ("Associated"), Federal Insurance Company ("Federal"), Fireman's Fund Insurance Company ("Fireman's Fund"), Travelers Casualty and Surety Company ("Travelers"), OneBeacon American Insurance Company ("OneBeacon"), and Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA ("the Chartis Defendants"). For the following reasons, the trial court's judgment will be reversed and the matter will be remanded for further proceedings.

## I. Factual and Procedural History

{¶ 2} In May 2012, MW Custom Papers filed a declaratory judgment action against 41 insurance companies, seeking various declarations regarding the insurers' duties and obligations to pay defense costs and/or damages for asbestos-related bodily injury claims allegedly covered by their policies. MW Custom Papers also filed breach of contract and

equitable estoppel claims against Continental Casualty Company, which are not pertinent to this appeal. The complaint alleges the following facts, which, for purposes of this appeal, we presume to be true[1]:

{¶ 3} From 1958 to 1985, The Mead Corporation purchased written primary, excess and/or umbrella general liability policies that provided insurance coverage for asbestos-related liabilities. MW Custom Papers LLC is the successor by merger to The Mead Corporation, including certain underlying asbestos-related liabilities and the company's rights under the insurance policies covering those liabilities.

{¶ 4} MW Custom Papers (hereafter "Mead") has been named as a defendant or third-party defendant in numerous lawsuits or claims for bodily injury, personal injury, or death resulting from exposure to certain asbestos-containing products. Mead believes that additional claims will be asserted against it in the future.

{¶ 5} According to Mead, each insurer has an indivisible duty to provide Mead with a full defense and/or indemnification of defense costs, and full indemnification of settlements or judgments "in which any part of the continuous and/or progressive injury process is alleged to have existed during any part of a policy period of the Policy or Policies issued by the [Insurers], subject only to the applicable limit of liability, if any, contained in that Insurer's Policy or Policies." Mead states that it is "entitled to select which of the triggered Policies should respond to each Asbestos Bodily Injury Claim."

{¶ 6} Mead's complaint describes the company's prior course of dealing regarding coverage as follows:

---

[1] This is true whether the motions to dismiss were filed pursuant to Civ.R. 12(B)(1) or (B)(6). *See* ¶ 19 et seq., infra.

23. Prior to 2006, non-parties Liberty Mutual Insurance Company ("Liberty Mutual") and American Motorists Insurance Company ("AMICO"), who issued primary general liability policies to Mead during the periods 1958 to 1981 and 1981 to 1986, respectively, paid certain defense and indemnity costs with respect to Asbestos Bodily Injury Claims against Mead. In late 2005 and early 2006, the primary general liability policies issued by Liberty Mutual and AMICO were exhausted as a result of payments on account of Asbestos Bodily Injury Claims.

24. Following exhaustion of the Liberty Mutual and AMICO primary policies, Mead requested coverage for the Asbestos Bodily Injury Claims from certain of the Defendants [Insurers] under the terms of their respective umbrella and/or excess policies, and timely placed those Defendants on notice that they would be required under their respective Policies to pay for the investigation, defense and settlements or judgments in connection with the Asbestos Bodily Injury Claims.

25. In response to Mead's requests, certain Defendants have paid certain defense and indemnity costs with respect to Asbestos Bodily Injury Claims. More specifically, certain Defendants have paid certain defense and indemnity costs pursuant to cost-sharing agreements executed between those insurers and Mead. Other Defendants, including Continental Casualty Company ("CCC"), have paid certain defense and indemnity costs on a claim-by-claim basis. Additionally, non-party AMICO paid certain defense

and indemnity [costs] under an umbrella/excess policy issued to Mead. The applicable limits of the AMICO excess/umbrella policy have been exhausted as a result of payments on account of Asbestos Bodily Injury Claims.

26. Until April 12, 2012, Defendant CCC paid certain defense and indemnity costs incurred with respect to Asbestos Bodily Injury Claims on a claim-by-claim basis, without properly notifying Mead that it believed the applicable limits of any CCC Policies were exhausted or nearing exhaustion.

27. It is a custom, practice and obligation of insurers to notify their policyholders of the alleged exhaustion of any allegedly-applicable limits of liability. This custom, practice and obligation stems from, *inter alia*, the fundamental duty of good faith and fair dealing.

28. Prior to April 12, 2012, CCC had paid to Mead more than the "occurrence" limits of certain CCC policies, but less than the applicable "aggregate" limits. Then, on April 12, 2012, without prior notice, warning or discussion of the applicable limits of liability, CCC filed an unannounced lawsuit against Mead in Illinois state court (the "Illinois Action") alleging, *inter alia*, that per occurrence limits applied retroactively and, therefore, that CCC was entitled to recoup alleged overpayments, of which Mead had no prior notice. * * *.

29. CCC's Complaint in the Illinois Action requests certain other relief and states that the relief requested therein will "necessarily affect the allocation of coverage among [Mead's] umbrella and excess policies."

However, CCC's Complaint in the Illinois Action does not raise many of the claims raised herein, and it also selectively names as defendants only certain of the Defendant-Insurers named herein, making the Illinois Action necessarily less comprehensive than this action and precluding the full relief now sought by Mead.

**{¶ 7}** Mead states that it seeks "to ensure that the coverage it is owed will be paid by Defendants. Thus, this action is necessary and * * * presents justiciable controversies between Mead and the Defendants [Insurers] that are ripe for immediate resolution."

**{¶ 8}** In its first cause of action,[2] Mead requested declarations regarding the defendants-insurers' duties and obligations under their policies with respect to the asbestos litigation. Specifically, Mead asked for declarations stating:

a. that Defendants have a duty to defend and/or to pay Mead's defense costs incurred by reason of the Asbestos Bodily Injury Claims, and that Defendants have a duty to indemnify Mead for all liabilities, damages, costs, and payments (whether by judgment, settlement, or otherwise) and all other sums incurred to date by Mead or which may be incurred on account of the Asbestos Bodily Injury Claims, subject only to the annual aggregate and/or per occurrence limits, if applicable, of the Defendants' respective policies;

b. that each Defendant has a joint and several obligation (subject to the exhaustion of applicable underlying coverage) to provide Mead a full

---

[2] As stated above, Mead brought two additional claims against CCC. Those claims are not relevant to this appeal.

defense and to pay all for investigations, settlements and judgments in connection with every Asbestos Bodily Injury Claim in which any portion of the continuous or progressive injurious process (including exposure or progression of the pathology or manifestation) is alleged to have occurred or occurred during the policy period of a policy issued by the Defendant;

    c.  that for each Policy triggered by an Asbestos Bodily Injury Claim, the Defendant(s) that issued or subscribed to that Policy are liable in full to provide complete coverage for the Claim (subject to the triggered Policies' limits of liability and exhaustion of applicable underlying limits, if any);

    d.  that, where an Asbestos Bodily Injury Claim triggers more than one Policy, Mead may select which triggered Policy or Policies must first respond to and provide coverage for the Asbestos Bodily Injury Claim; and

    e. as to the extent to which the Asbestos Bodily Injury Claims constitute a single occurrence or multiple occurrences under the Policies.

Mead alleged that each defendant "disputes, or has asserted a conflicting position regarding one or more of the contentions in the preceding paragraph 33 [the requested declarations paragraph] and/or is included as a defendant to the extent they are an indispensible [sic] party." Mead further stated that declaratory relief would terminate some or all of the disputes and controversies between the parties.

{¶ 9} On June 15, 2012, OneBeacon and the Chartis Defendants moved to dismiss Mead's complaint against them, alleging that no justiciable issues exist because the policies could not be triggered based upon current underlying damages. The insurers stated that they

were "high level excess insurers who issued insurance policies which cannot be triggered until at least $270 million of underlying liability is exhausted through payment of claims. There is no damage threat that is remotely near that level of liability." The insurers argued, citing *Bilyeu v. Motorist Mut. Ins. Co.*, 36 Ohio St.2d 35, 303 N.E.2d 871 (1973), that Mead had not alleged that its underlying liabilities were sufficient to trigger coverage under the high level excess policies. Citing *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, the insurers also argued that Mead had not alleged that it presented a claim to them and/or that they had denied any claim by Mead. OneBeacon and the Chartis Defendants supported their motion with the declaration pages from the policies at issue and an affidavit authenticating those pages and stating that $270 million in underlying liability was required to trigger their coverage.

{¶ 10} On June 21, 2012, Fireman's Fund joined OneBeacon's and the Chartis Defendants' motion to dismiss for want of justiciability. Fireman's Fund asserted that the lowest attachment point of any of their policies was $65 million. On June 28, 2012, Federal also joined the motion, stating that its single, high-limit excess policy required the exhaustion of $50 million in underlying insurance limits before coverage would be triggered. On July 2, 2012, Travelers joined the motion to dismiss for lack of justiciability, stating that at least $45 million in underlying insurance would need to be exhausted before its high excess policies were triggered. Associated joined the motion to dismiss on July 6, 2012, stating that its attachment point was $50 million. Federal, Associated, Fireman's Fund, and Travelers each attached the declaration pages of the relevant policies to their motions. Federal and Associated also filed affidavits authenticating their declaration pages.

{¶ 11}  Mead opposed the motions to dismiss.  It argued that (1) the facts set forth in its complaint sufficiently alleged a justiciable controversy, (2) it was not required to submit a claim for a definite sum and have that claim denied in order to have a justiciable controversy, and (3) the insurers' positions regarding the attachment point of their policies was "evidence, in and of itself, of a present and immediate controversy, as it is inconsistent with Ohio law, including the applicable 'all sums' allocation that applies to the Policies at issue in this action."  Mead further stated: "[T]he higher-layer excess Policies at issue in these Motions are all 'follow form' policies that adopt the terms and conditions of lower layer policies.  It would be neither practical nor desirable to require, as the Defendant Insurers suggest, the presentation and refusal to pay specific amounts of damages from each insurer prior to the adjudication of coverage under higher layer policies."

{¶ 12}  In September 2012, the trial court granted the motions to dismiss.  Citing *Kincaid*, the trial court initially stated Mead had never presented an asbestos liability claim to the high-level excess insurers with proof of how much was owed.  The court noted that low-level primary and umbrella carriers had defended and indemnified Mead in the past.  The trial court further stated:

> MW Custom Papers already has allocated its asbestos claims "horizontally" and across all triggered underlying coverage by entering cost share agreements with the underlying carriers.  In this regard, the 6th Circuit's decision in *GenCorp, Inc. v. AIU Ins. Co.*, 138 Fed. Appx. 732; 2005 U.S. App. LEXIS 13669 (6th Cir.) is on point.  In *GenCorp* excess carriers were granted a credit for the full limits of all underlying coverage

when a policyholder chose to enter settlements with underlying carriers in multiple years of horizontal layers of coverage. As the *GenCorp* court noted:

> [B]y settling with its primary and umbrella insurers, GenCorp had made the choice to allocate its liability as broadly as possible, which meant that it has to demonstrate that its liabilities would exceed the cumulative limits of all the primary and umbrella policies before it could trigger the excess policies.
>
> MW Custom allocated its asbestos liability horizontally across primary policies issued from 1958 to 1986 before that coverage was exhausted in 2006. Since 2006, MW Custom Papers has allocated its asbestos liability horizontally across first layer umbrella policies by entering "cost sharing" settlement agreements with those carriers.

The court dismissed the insurers at issue ("the Dismissed Insurers") for lack of a justiciable claim.

{¶ 13} Mead appeals the trial court's judgment, raising one assignment of error.

## II. Justiciability of Mead's Claims

{¶ 14} Mead's sole assignment of error states: "The trial court erred in dismissing the defendant insurers for lack of a justiciable controversy."

{¶ 15} The Declaratory Judgment Act, R.C. 2721.02, authorizes courts of record to "declare rights, status, and other legal relations whether or not further relief is or could be

claimed." R.C. 2721.02(A). A declaratory judgment may be either affirmative or negative in form and effect, and the declaration has the effect of a final judgment or decree. *Id*. With the exception of actions brought by non-insureds against insurers (which does not apply here), a contract may be construed by a declaratory judgment or decree either before or after there has been a breach of the contract. R.C. 2721.04; *see* R.C. 2721.02(B). The Declaratory Judgment Act is a remedial statute, which should be liberally construed and administered. R.C. 2721.13.

{¶ 16} Nevertheless, "it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies." *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970), quoted by *Kincaid* at ¶ 9; *see also* Ohio Constitution, Article IV, Section 4(B).

{¶ 17} To be justiciable, a controversy must be grounded on a present dispute, not on a possible future dispute. *Kincaid* at ¶ 17, citing *Mid-American Fire & Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, ¶ 9. And, the Declaratory Judgment Act expressly states that courts of record "may refuse to render or enter a declaratory judgment or decree under [R.C. Chapter 2721] if the judgment or decree would not terminate the uncertainty or controversy giving rise to the action or proceeding in which the declaratory relief is sought." R.C. 2721.07.

{¶ 18} We review the dismissal of a declaratory judgment action for want of

justiciability for an abuse of discretion. *Mid-American*, at paragraph two of the syllabus; *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 13 ("[W]e reiterate that the abuse-of-discretion standard applies to the review of a trial court's holding regarding justiciability; once a trial court determines that a matter is appropriate for declaratory judgment, its holdings regarding questions of law are reviewed on a de novo basis."). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Kleemann v. Carriage Trace, Inc.*, 2d Dist. Montgomery No. 21873, 2007-Ohio-4209, ¶ 95, quoting *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 19} Initially, Mead asserts that the trial court abused its discretion in considering matters outside of the complaint. The Dismissed Insurers' motions to dismiss were brought pursuant to "Civ.R. 12(B)," without specifying Civ.R. 12(B)(1) or Civ.R. 12(B)(6). Mead states that, under either Rule, the trial court was required to accept the factual allegations in the complaint as true and to confine itself to those factual allegations.

{¶ 20} "A motion to dismiss a complaint for failure to state a claim upon which relief can be granted, pursuant to Civ.R.12(B)(6), tests the sufficiency of a complaint." *Grover v. Bartsch*, 170 Ohio App.3d 188, 2006-Ohio-6115, 866 N.E.2d 547, ¶ 16 (2d Dist.). The court must construe the complaint in the light most favorable to the plaintiff, presume all of the factual allegations in the complaint as true, and make all reasonable inferences in favor of the plaintiff. *Id.*, citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). A motion to dismiss under Civ.R. 12(B)(6) should be granted only where the complaint, so construed, demonstrates that plaintiff can prove no set of facts

entitling him to relief. *Id.*

**{¶ 21}** Similar principles control a Civ.R. 12(B)(1) motion; the court must determine whether the plaintiff has alleged any cause of action cognizable by the forum. *See Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St.2d 608, 611, 433 N.E.2d 572 (1982) (overruled on other grounds). In general, "[t]he existence of jurisdiction in a declaratory-judgment action must be evident from the allegations in the complaint." *Pointe At Gateway Condominium Owner's Assn., Inc. v. Schmelzer*, 8th Dist. Cuyahoga Nos. 98761, 99130, 2013-Ohio-3615, ¶ 27. However, a trial court is not confined to the allegations of the complaint when determining its subject-matter jurisdiction under Civ.R. 12(B)(1), and it may consider pertinent material without converting the motion into one for summary judgment. *Southgate Dev. Corp. v. Columbia Gas Transmission Corp.*, 48 Ohio St.2d 211, 358 N.E.2d 526 (1976), paragraph one of the syllabus; *State v. While*, – N.E.2d –, 2014-Ohio-130, ¶ 23 (2d Dist.).

**{¶ 22}** The question of the trial court's authority to consider a declaratory judgment action is not in dispute. Here, the only evidence outside the complaint that was offered by the Dismissed Insurers was the declaration pages of their respective policies, which purportedly established the amount of underlying coverage that needed to be exhausted before their policies applied. Regardless of whether the trial court properly considered these documents, we do not find that it resolves whether Mead presented a justiciable controversy against the Dismissed Insurers.

**{¶ 23}** Mead asserts that its complaint adequately alleges a justiciable controversy between it and the Dismissed Insurers and that the trial court abused its discretion in basing

its ruling on facts not supported by the record. Mead further asserts that the trial court erroneously applied *GenCorp. v. AIU Ins. Co.*, 138 Fed.Appx. 732, 2005 WL 1607035 (6th Cir.2005) and *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, to conclude that no justiciable controversy exists.

**{¶ 24}** According to Mead's complaint, Mead first looked to its primary insurance carriers for coverage for the asbestos-related personal injury claims. After exhausting its primary coverage, Mead turned to certain umbrella/excess policies. Some of those excess insurers "have paid certain defense and indemnity costs pursuant to cost-sharing agreements executed between those insurers and Mead," while others, such as CCC, "have paid certain defense and indemnity costs on a claim-by-claim basis." The complaint states that the applicable limits of the excess/umbrella policy issued by AMICO have been exhausted, but there is no allegation that the limits of any other excess/umbrella policy have been reached.

**{¶ 25}** In support of its assertion that the complaint adequately alleges justiciable claims against the Dismissed Insurers, Mead focuses on its allegations that (1) the asbestos bodily injury claims are claims covered under the policies (Compl. ¶ 31); (2) each insurer has an indivisible duty to provide Mead with a full defense and/or indemnification, subject to the policies' applicable limits of liability (*Id*. at ¶ 19); (3) Mead is entitled to select which of the triggered policies should respond to each asbestos claim (*Id*. at ¶ 20); (4) the action presents justiciable controversies (*Id*. at ¶ 21, ¶ 32); and (5) each insurer disputes or has asserted a conflicting position regarding one or more of the declarations requests by Mead and/or is an indispensable party (*Id*. at ¶ 35).

**{¶ 26}** On its face, these allegations in Mead's complaint set forth justiciable

claims against all of the insurers. Simply stated, the complaint alleges facts indicating that actual disputes exist between Mead and its insurers regarding the parties' duties and obligations under the various policies and/or that the insurers have been joined as indispensable parties.[3] Mead asserts that *all* of the insurers have a duty to defend its claims and that Mead may select which triggered policy has an obligation to respond to claims. The complaint indicates that common questions exist among the insurers regarding, among other things, the meaning of "occurrence" and the method of allocating liability.

{¶ 27} Mead has attached a copy of CCC's complaint in the Illinois action to its (Mead's) complaint. CCC's complaint alleges that Mead's liability in the asbestos bodily injury lawsuits was based on Mead's manufacture and sale of asbestos-containing paper. CCC's complaint reflects that disagreements exist between CCC and Mead regarding whether the continuing process of manufacturing and selling of asbestos-containing products constituted a single occurrence, as opposed to multiple occurrences, under the policies and whether the occurrence limits applied to the entire multi-year policy period of the respective policies, as opposed to the aggregate limits in those policies, which apply annually.

{¶ 28} Mead's complaint notes that CCC's Illinois complaint acknowledges that the relief requested therein would "necessarily affect the allocation of coverage among [Mead's] umbrella and excess policies." Mead alleges that, unlike the Illinois action, its

---

[3] Civ.R. 19(A) provides, in relevant part: "A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (a) as a practical matter impair or impede his ability to protect that interest or (b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest, or (3) he has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee."

action includes all relevant insurers and would provide a uniform and comprehensive interpretation of the duties and obligations of the umbrella and excess insurers in relation to Mead and each other. In our view, the declaratory judgment act was intended to address such issues.

{¶ 29} Mead complains that the trial court's decision was based on factual findings that could not be inferred from the complaint and were not supported by the record. Specifically, Mead refers to two statements by the trial court: (1) "MW Custom Papers already has allocated its asbestos claims 'horizontally' and across all triggered underlying coverage by entering cost share agreements with the underlying carriers" and (2) "MW Custom allocated its asbestos liability horizontally across primary policies issued from 1958 to 1986 before that coverage was exhausted in 2006. Since 2006, MW Custom Papers has allocated its asbestos liability horizontally across first layer umbrella policies by entering 'cost sharing' settlement agreements with those carriers."

{¶ 30} Construing Mead's complaint in the light most favorable to it, Mead did not allege that it allocated its asbestos liability horizontally across the primary polices.[4] Rather,

---

[4] In *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, the Ohio Supreme Court described two methods of distributing losses across the triggered policies:

> There are two accepted methods for allocating coverage. One approach * * * permits the policyholder to seek coverage from any policy in effect during the time period of injury or damage. This "all sums" approach allows [the insured] to seek full coverage for its claims from any single policy, up to that policy's coverage limits, out of the group of policies that has been triggered. In contrast, * * * [u]nder the pro rata approach, each insurer pays only a portion of a claim based on the duration of the occurrence during its policy period in relation to the entire duration of the occurrence. It divides "a loss 'horizontally' among all triggered policy periods, with each insurance company paying only a share of the policyholder's total damages."

Mead alleged that the two companies with primary policies paid certain defense and indemnification costs and that those policies are now exhausted. The complaint did not specify how Mead presented claims and exhausted its primary policies before turning to its excess/umbrella polices. With respect to the umbrella and excess insurers, the complaint merely refers to costs paid by "certain Defendants."

{¶ 31} In addition, Mead specifically alleges that each insurer is jointly and severally liable for "all liabilities, damages, costs, and payments," "all other sums incurred to date by Mead or which may be incurred on account of the Asbestos Bodily Injury Claims, subject only to the annual aggregate and/or per occurrence limits, if applicable, of the Defendants' respective policies." Mead's complaint appears to ask the court to declare that an "all sums" approach be used to allocate liability among Mead's insurers. While the Dismissed Insurers may be correct that Mead is presently allocating its liability horizontally among its umbrella and low-level excess insurers, the complaint does not require such a conclusion. The fact that Mead exhausted both primary policies before turning to umbrella/excess policies does not necessarily mean that Mead rejected an "all sums" approach. See *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 12 (under an "all sums" approach, if the selected policy does not cover the insured's entire claim, then the insured may pursue coverage under other primary or excess insurance policies.).

{¶ 32} In addition, based on the allegations of the complaint, we disagree with the trial court's conclusion that the Sixth Circuit's decision in *GenCorp* is on point. In that

*Id.* at ¶ 6.

case, GenCorp had reached a settlement (for less than the policy limits) with its primary and umbrella insurers concerning the company's liability at six environmental sites and subsequently sought to recover from its excess insurers amounts in excess of those settlements for which GenCorp may become liable. The trial court granted summary judgment to the excess insurers, holding that the combined limits of GenCorp's primary policies exceeded GenCorp's own maximum estimates of its liability at the six sites and thus the excess insurers had no obligation to reimburse GenCorp for its losses due to environmental damage at the six sites. *GenCorp, Inc. v. AIU Ins. Co.*, 297 F.Supp.2d 995, 1001 (N.D.Ohio 2003).

{¶ 33} In so holding, the trial court rejected GenCorp's position, under *Goodyear*, that GenCorp could allocate its liability during a particular policy period to the coverage provided in a single year by a single primary policy and "rise up" to the excess coverage without exhausting other primary coverage. *Id.* at 1007. The trial court found that GenCorp precluded itself from taking this approach by settling with its primary and umbrella insurers. The Sixth Circuit agreed with the trial court and affirmed. *GenCorp.*, 2005 WL 1607035, *2. The Sixth Circuit reasoned, "[B]y settling with its primary and umbrella insurers, GenCorp had made the choice to allocate its liability as broadly as possible, which meant that it had to demonstrate that its liabilities would exceed the cumulative limits of all the primary and umbrella policies before it could trigger the excess policies." *Id.*

{¶ 34} Mead did not allege that it settled with any primary, umbrella, or excess insurers, nor has it alleged that the cost-sharing agreements between certain insurers and Mead constituted an election to allocate its liability horizontally among the various tiers of

insurers. The cost-sharing agreements are not before this court, and we cannot speculate as to the nature of the agreements' terms. With the limited record before us, *GenCorp* appears to be inapposite.

{¶ 35} The Dismissed Insurers argue that the trial court's decision must be affirmed, because *Kincaid* provides that an insurance action is not justiciable when the insured has presented no claims triggering coverage.

{¶ 36} In *Kincaid*, the plaintiff (Kincaid) was involved in an automobile accident and he had an insurance policy with Erie Insurance Company. Erie hired counsel to represent Kincaid, and the liability action ultimately settled. Afterward, Kincaid brought a class action against Erie alleging that Erie had failed to compensate and reimburse him and all other similarly situated Erie policyholders for expenses such as postage, travel expenses, and actual loss of earnings that they had incurred during Erie's defense of their liability claims. Kincaid alleged that these were covered expenses under the "additional payments" provision of the policy's liability-protection section. Kincaid asserted causes of action for breach of contract, bad faith and breach of the covenant of good faith and fair dealing, and unjust enrichment, and he sought declaratory relief. *Kincaid*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, at ¶ 4.

{¶ 37} Erie's answer admitted that Kincaid's insurance policy included coverage for "additional payments" and that the insurer reimbursed expenses incurred if they were documented and presented as a claim. *Kincaid* at ¶ 5. Erie stated that Kincaid had never requested reimbursement or presented a claim for reimbursement of expenses, and it sought judgment on the pleadings, pursuant to Civ.R. 12(C), which the trial court granted. The

court of appeals reversed the trial court on all but the unjust enrichment claim.

{¶ 38} On review, the Supreme Court of Ohio reversed and reinstated the trial court's dismissal of the action on the ground that no justiciable controversy existed. The court reasoned:

> * * * Because Erie was not advised of Kincaid's claim and has not refused to pay, there is no dispute and there can be no breach of contract. A claim for bad faith grounded in the insured's wrongful refusal to pay likewise fails as a matter of law, since Erie did not refuse to pay. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397. An action for declaratory judgment also requires an actual controversy; a possible future controversy is not sufficient. *Mid-American Fire* at ¶ 9.

*Kincaid* at ¶ 17. The supreme court thus held:

> [T]here is no actual controversy between adverse parties in this case because Erie has not refused to pay Kincaid for expenses that may be covered by the "additional payments" provision of the policy. Unless and until the insured has presented a claim to his or her insurer and (where appropriate) proof of how much is owed, and the insurer has either (1) denied the claim or (2) failed to respond to the claim after having had an adequate opportunity and reasonable time within which to respond, then there is no controversy and the insured has no standing to file a complaint in litigation. A court may not issue an advisory opinion on whether an insured is entitled to insurance coverage, and an advisory opinion is what is being sought in this case, since

no loss has been identified and no claim has been made for payment. Upon review of the pleadings, we hold that no material factual issues exist and that Erie was entitled to judgment as a matter of law.

*Kincaid* at ¶ 20, as modified on reconsideration.

**{¶ 39}** The procedural posture and pleadings in *Kincaid* render it distinguishable from the case before us. In *Kincaid*, the insurer had filed an answer, which did not dispute the plaintiff-insured's assertion that the insurance policy at issue included coverage for "additional payments"; Erie agreed that it was obligated to reimburse its insureds for expenses incurred if properly presented. Accordingly, upon consideration of both the complaint and answer, pursuant to the Civ.R. 12(C) motion, the record reflects that no actual controversy existed at that time regarding the construction of the policy. And because Kincaid had not yet presented a claim to Erie for his expenses, it was uncertain whether any actual controversy would exist in the future.

**{¶ 40}** In contrast, the instant matter is an appeal from a dismissal pursuant to Civ.R. 12(B). At this juncture, the only pleading before us is Mead's complaint and the exhibits attached to it. (The pleading purports to incorporate each of the insurance policies at issue, but they were not attached to the complaint due to the voluminous nature of the documents.) The Dismissed Insurers have not filed answers agreeing or disagreeing with any or all of Mead's interpretation of the policies at issue. Rather, at this juncture, we merely have Mead's allegation that the defendant-insurers dispute or have asserted conflicting positions regarding the issues for which Mead has requested a declaratory judgment. With this procedural posture, we cannot conclude that Mead was required to

have presented claims to the Dismissed Insurers and have those claims denied in order to have a justiciable claim. *See* R.C. 2721.04.

{¶ 41} The Dismissed Insurers further assert that, under *Bilyeu*, 36 Ohio St.2d 35, 303 N.E.2d 871 (1973), the trial court had discretion to dismiss Mead's declaratory judgment claims in the absence of actual claims triggering coverage. In *Bilyeu*, a minor was involved in an automobile accident with an uninsured motorist; she was covered by two policies issued to her father, both of which limited liability to $10,000 for coverage against uninsured motorists. The minor and her father brought a declaratory judgment action concerning whether either of the plaintiffs (the insureds) was bound by arbitration provisions in the policies, the setoff of medical expenses, and the "pyramiding" of coverage. The trial court had found that the parties were bound by the arbitration provision, and it dismissed the other questions on the ground that no real and substantial controversy existed.

{¶ 42} The supreme court agreed, stating that a "controversy exists only if the arbitrator makes an award over the limit of one of the policies ($10,000). As yet, there is no arbitrator and no award has been made." *Bilyeu* at 37. The court noted that "a determination as to the granting or denying of declaratory relief is one of degree. Although this court might agree or disagree with that determination, our decision must be whether such a determination is reasonable." *Id*. The supreme court concluded that "it was not unreasonable for the lower courts to decide that the events which could arise from this controversy may never happen. The controversy might be settled by the parties, or the arbitrator's award might be less than $10,000. Those are possibilities which the courts below [no] doubt considered in determining that a declaratory judgment did not lie." *Id.*

**{¶ 43}** Although instructive, *Bilyeu* is not dispositive to the issue before us. In *Bilyeu*, the pyramiding of policies needed to be addressed only if damages exceeded $10,000, a matter which was subject to arbitration and, possibly, settlement. In contrast, the instant litigation involves multi-year, multi-layered insurance policies issued by numerous insurers to Mead. The insurance dispute stems from numerous asbestos bodily injury lawsuits against Mead, for which Mead has incurred damages and will be required to expend substantial amounts of money in the future in defending current and future claims. Although no claims have been filed by Mead against the Dismissed Insurers, Mead (and, we believe, many of the insurers) has a real and substantial present interest in determining how the various policies are triggered, how costs are allocated among the triggered policies, how many occurrences are involved under the terms of the policies, and how and when lower-layer policies exhaust and higher-layer policies attach, among other issues.

**{¶ 44}** We acknowledge that insurance policies, let alone the litigation and judicial opinions sometimes arising from them, can generate "inspissate brumes,"[5] but under the procedural and factual circumstances of this case, we conclude that the trial court erred in dismissing the high-level excess insurers for want of justiciability.

**{¶ 45}** Mead's assignment of error is sustained.

### III. Conclusion

**{¶ 46}** The trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

---

[5] This phrase has been used to describe the federal sentencing guidelines. *United States v. Stearns*, 68 F.3d 328, 330 (9th Cir.1995), abrogated on other grounds by *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

. . . . . . . . . .

FAIN, J. and WRIGHT, J., concur.

(Hon. Thomas R. Wright, Eleventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

James A. Dyer
Toby K. Henderson
Stephen V. Freeze
Daniel F. Gourash
Robert D. Anderle
Ronald B. Lee
Moira H. Pietrowski
Patrick M. Shine
David W. Walulik
Arthur M. Kaufman
Christopher W. St. Marie
Danny Newman
Robert Eddy
David Orlandini
Thomas Whelley
Joseph Krella
Jeffrey Cox
Thomas Bruns
Thomas Doyle
Hon. Timothy N. O'Connell